# IN THE UNITES STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

In Re:

      **ROBERT J. LUPO,**

                       **Debtor.**

_____

**SOUTH ATLANTA NEUROLOGY
AND PAIN CLINIC, P.C.,**
                     **Plaintiff,**

     **v.**

**ROBERT J. LUPO,**
                    **Defendant.**

In Proceedings Under Chapter 7

**Case No.: 05-22285**

**Adv. Pro No. 05-1738**

**CHIEF JUDGE RANDOLPH BAXTER**

## MEMORANDUM AND ORDER

      This matter before the Court is South Atlanta Neurology and Pain Clinic, P.C.'s

("South Atlanta") complaint to determine dischargeability of debt against Robert J. Lupo

("Debtor" or "Lupo"). The Court acquires core matter jurisdiction over this proceeding

under 28 U.S.C. 157(a) and (b)(2)(A), (I) and (O) and General Order No. 84 of this

District. Upon an examination of the parties' respective briefs and supporting

documentation, and after conducting a trial on the matter, the following findings of fact

and conclusions of law are hereby rendered:

                                   *

      Infinite View, Inc. (hereinafter, "Infinite View"), an Ohio corporation owned by

the Debtor, previously engaged in the business of brokering and remanufacturing MRI

equipment, entered into a written purchase proposal (the "Proposal") and sales agreement

("Sale Agreement") with South Atlanta wherein Infinite View would sell a 1999 Hitachi

Aris II Open MRI System (the "MRI System") to South Atlanta for the total purchase

price of $385,000.00.  Plaintiff's Exhibits 11 and 12.  South Atlanta tendered

$77,000.00 (the "Deposit") to Infinite View, representing the deposit due for the purchase

of the MRI System.  Id.  Pursuant to the Agreement, Infinite View was to ship the MRI

System to South Atlanta no later than June 1, 2005.  Id.  The delivery date was amended

to June 20, 2005 by an addendum executed by the parties ("Addendum").  Plaintiff's

Exhibit 26.

Prior the execution of the Proposal and the Agreement, Infinite View executed a

Purchase Proposal to acquire a 1999 Hitachi Aris II Open MRI System from a third party

known as Medical Arts Commack, for $300,000.  Plaintiff's Exhibit 49.  Subsequently,

Infinite View tendered to Medical Arts Commack a deposit of $10,000 for the purchase

of 1999 Hitachi Aris II Open MRI System.  Plaintiff's Exhibit 50.

Prior to the execution of the Proposal and Agreement with South Atlanta, Infinite

View was a defendant in a civil action captioned River Radiology, PLLC v. Infinite

View, Inc., which was filed in the Lake County, Ohio Court of Common Pleas.  River

Radiology, the plaintiff therein, obtained an agreed judgment against Infinite View in the

amount of $95,000.00, plus interest.  Plaintiff's Exhibit 3.  Subsequently, on two separate

occasions, River Radiology caused the Lake County Sheriff to perform a levy of

execution upon the assets of Infinite View at its business address in Willoughby, Ohio.

Plaintiff's Exhibit 4 and 6. Thereafter, River Radiology and Infinite View entered into a

consent entry in the state court action, whereby River Radiology was permitted to sell the

levied property towards the satisfaction of its judgment.  Plaintiff's Exhibit 13.

Prepetition, South Atlanta filed a lawsuit against Infinite View and Lupo in Henry

County, Georgia asserting claims of breach of contract, fraud and conversion.  Therein, in

the matter of South Atlanta Neurology & Pain Clinic, PC v. Infinite View, Inc. et al., the

court entered an order granting default judgment in favor of South Atlanta against Infinite

2

View, which included compensatory and punitive damages in the sum total of $541,000.00 plus interest (the "Georgia Judgment"). Plaintiff's Exhibits 37 and 46. The action, as it pertained to Lupo, was stayed due to his pending Chapter 7 case. Plaintiff's Exhibit 46.

**

On August 16, 2005, Lupo filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Lupo's Schedule F ("Creditors Holding Unsecured Nonpriority Claims") includes the claim of South Atlanta in the amount of $77,000.00, and notes that the claim was a corporate obligation only – listed for precaution.

South Atlanta commenced the above captioned adversary proceeding, seeking to determine the dischargeability of its debt pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6) (the "Complaint"). South Atlanta alleges in the Complaint that Infinite View did not operate as a corporation and was the alter ego of Lupo, and that Lupo should be held personally liable for the acts of Infinite View and its representatives. South Atlanta also alleges that Lupo owes debts to South Atlanta that are nondischargeable because: (1) the debts were obtained by false pretenses, false representations and/or actual fraud by Lupo, (2) the debts arise from Lupo's acts of larceny and fraudulent actions while acting in a fiduciary capacity; and (3) the debts arise from a willful and malicious injury resulting from a scheme of misconduct by Lupo.

In his Answer, Lupo admits that he was the sole shareholder and president of Infinite View. Notwithstanding, he asserts that it was one Kyle Lulow, on behalf of Infinite View, who entered into the Proposal, Agreement and Addendum with South Atlanta for the sale and delivery of the MRI System. Lupo asserts that it was Infinite View, as opposed to himself, which accepted the Deposit and promised delivery of the MRI System. Lupo denies South Atlanta's allegations and asserts that he is not

3

personally liable for the debts of Infinite View. Additionally, he asserts that the debt allegedly owed by him to South Atlanta is fully dischargeable.

***

The contentions of the parties reveal two dispositive issues. First, should the Debtor be held personally liable for the actions of Infinite View and its representatives. Second, has South Atlanta sufficiently met its burden, which would warrant a determination that its debts are nondischargeable pursuant to §§ 523(a)(2)(A), (a)(4) and/or (a)(6).

****

## I.    Piercing the Corporate Veil

"A corporation is a separate legal entity from its shareholders, even where there is but one shareholder." LeRoux's Billyle Supper Club v. Ma, 77 Ohio App.3d 417, 602 N.E.2d 685, 687 (Ohio App. 6th Dist.1991). However, under Ohio law, circumstances may exist where courts will disregard the corporate form and hold an individual shareholder liable for corporate misdeeds. This is often referred to as "piercing the corporate veil." The corporate entity and the individual shareholder are then treated as a single entity and the corporate liabilities become the liabilities of the individual shareholder. In order to pierce the corporate veil, a plaintiff must prove by a preponderance of the evidence that:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted from such control and wrong.

Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos., 67 Ohio St.3d 274, 617 N.E.2d 1075, 1086 (1993); Zimmerman v. Eagle Mortgage Corp., 110 Ohio App.3d 762,

4

772, 675 N.E.2d 480, 486 (1996); see also Ferguson v. Strader, 94 Ohio App.3d 622, 628, 641 N.E.2d 728, 731 (1994). The three-part Belvedere test is a conjunctive test, therefore requiring a plaintiff to satisfy all three prongs to pierce the corporate veil of a corporation.

The first prong of the piercing the corporate veil test is a restatement of the alter-ego doctrine, which requires a plaintiff "show that the individual and the corporation are fundamentally indistinguishable." Id. In deciding whether the company is an alter ego of the individual, Ohio courts consider such factors as:

> (1) grossly inadequate capitalization, (2) failure to observe the corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporate was a mere façade for the operations of the dominant shareholder(s).

LeRoux's Billyle Supper Club, 602 N.E.2d at 689 (citation omitted). Notwithstanding the aforementioned factors, "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." Carter-Jones Lumber Co. v. LTV Steel Co., 237 F.3d 745, 749 (6th Cir.2001) (applying Ohio law).

A corporation having one shareholder and officer does not, per se, signify that an individual shareholder exercised control and domination over a corporation. "A corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation." Zimmerman v. Eagle Mtge. Corp., 110 Ohio App.3d 762, 675 N.E.2d 480, 485 (Ohio App. 2nd Dist.1996). Some courts have held that this fact, alone, is sufficient to meet the first prong of the Belvedere test. See, e.g. Zimmerman, at 485 (stating "[t]he record is uncontroverted that Musgrave was the sole stockholder and director of Eagle and, as such, exercised complete control over Eagle's corporate affairs."); Stypula v. Chandler, No.2002-G-2468, 2003 WL 22844296, at *2

5

(Ohio App. 11 Dist. Nov. 26, 2003) (sole shareholder and director held personally liable); Intergy, Inc. v. Carrigan, No. 62210, 1993 WL 127089, at *2 (Ohio App. 8 Dist. Apr. 22, 1993).   Notwithstanding the aforementioned holdings, the mere fact that all or almost all of the corporate stock is owned by one individual or a few individuals will not afford sufficient grounds for disregarding corporateness.  See Belvedere Condominium Unit Owners' Ass'n, 617 N.E.2d 1075.

The evidence presented at trial supports a finding that Lupo exercised complete control over Infinite View.  The evidence includes an admission by Lupo that Infinite View was undercapitalized and insolvent.  Specifically, between late February and early March 2005, Infinite View had liabilities totaling $4.4 million and assets with a value of $40,000.  (Lupo, Cross-Examination).  The evidence also established that Lupo disregarded corporate formalities by knowingly allowing Kyle Lulow to hold himself out as a corporate officer.   Lupo testified that although Kyle Lulow signed the Agreement as vice-president, Lulow was not an officer of Infinite View. Id.; Plaintiff's Exhibit 39. Lupo testified that the position of vice-president was a nonchartered, in-house position/title given to Lulow by Lupo.  Id.  The evidence further illustrated a disregard of corporate formalities by Lupo where he admittedly used a checking account in the name of IVI Purchasing, a non-chartered Ohio corporation, to conduct Infinite View business. He also testified that he established a checking account for IVI Purchasing, using the Federal Taxpayer Identification Number of Infinite View.  Id.  Lupo admitted that he utilized the funds from the bank account of IVI Purchasing for his personal use.  Id.  He also admitted that the bank account of IVI Purchasing was the only bank account utilized by Infinite View from late 2004 to June 2005, when Infinite View ceased operations.  Id. The trial record contains reliable, probative, and substantial evidence supporting the conclusion that Infinite View did not have a separate mind, will, or existence of its own

6

and that Lupo alone controlled the corporation, thereby meeting the first prong of the Belvedere test.

The second prong of the Belvedere test requires the party seeking to pierce the corporate veil to establish that "control over the corporation by those to be held liable was exercised in such a manner to commit fraud or an illegal act against the person seeking to disregard the corporate entity." Belvedere Condominium Unit Owners' Ass'n, 617 N.E.2d at 1086. In support of its position, South Atlanta relies on the assertion that at the time the parties entered into the Agreement Infinite View was unable to meet the obligations of the Agreement, specifically as it related to the delivery of the MRI System. South Atlanta provides documents reflecting that the daily bank account balances of IVI Purchasing utilized by Infinite View's did not exceed a daily balance of $100,000.00 between the dates of January 2005 and June 2005. Plaintiff's Exhibit 58. Infinite View entered into a Purchase Proposal with Medical Arts Commack to purchase a MRI system, which was similar in make and model to the MRI System that was the subject of the Agreement. Plaintiff's Exhibit 49. Lupo testified that he was aware that Infinite View did not have the necessary funds to purchase the MRI System from Medical Arts Commack. (Lupo, Cross-Examination). He further stated that the MRI System could only be purchased from Medical Arts of Commack, if Infinite View received the required funds in advance from the buyer (South Atlanta). Id. In contrast, Lupo contends that the Medical Arts Commack transaction differed from the industry standard. Id. Lupo testified that the industry standard for the purchase of a used MRI machine, involved the end-user allowing a company like Infinite View to ship the machine to the destination location and participate in the sale before requiring payment. Id. Lupo testified that after the loss of the MRI machine in the Medical Arts Commack deal, Infinite View did not have a contract to purchase another MRI machine. Id.

7

Sufficient evidence was presented at trial to support a finding that Lupo personally, used his control of Infinite View to intentionally defraud or commit an illegal act against South Atlanta. Although Lupo exercised control over Infinite View, as determined supra, "mere control over a corporation is not in itself sufficient basis for shareholder liability." Belvedere 617 N.E.2d at 1086. South Atlanta presented evidence that there was an Agreement between it and Infinite View, which involved the purchase of a MRI System for the sum of $385,000.00. It was undisputed that South Atlanta paid to Infinite View the Deposit, which was never returned to South Atlanta when Infinite View failed to deliver the MRI System as contracted. However, "a simple breach of contract cannot suffice as the type of illegal or fraudulent act intended by the court in Belvedere." Taylor Steel, Inc. v. Keeton, 417 F.3d 598 (6th Cir.2005) (citing Wilton Corp. v. Ashland Castings Corp., 188 F.3d 670,674 (6th Cir.1999)). Nonetheless, Lupo continued to enter into and/or allow Infinite View's agents to enter into proposals and agreements for the sale of equipment that was subject to a state court judgment. The evidence presented illustrates that Lupo was well aware of the unstable nature of Infinite View's financial situation, as evinced by Lupo's own testimony. (Lupo, Cross-Examination). Lupo's further conduct of allowing a purported agent of Infinite View to enter into the Agreement with South Atlanta with full knowledge that Infinite View did not have the financial wherewithal to fulfill the terms of the Agreement, is indicative of fraud. Also, Lupo failed to deliver the MRI System to South Atlanta or, alternatively, return the Deposit to South Atlanta pursuant to the Agreement. Lupo actions via his control of Infinite View support a finding that Lupo used his control over Infinite View in such a manner to commit fraud or an illegal act against South Atlanta. Thusly, South Atlanta has met its burden as to the second prong of the Belvedere test.

8

The third and final prong of the <u>Belvedere</u> test requires a determination of whether the plaintiff suffered an injury or unjust loss that was a result of the defendant's control of the corporation and wrongful act(s). In construing the last prong of <u>Belvedere</u>:

> To the extent that such dominion exercised by [the defendant] was used in the present case to avoid paying for [corporate liabilities], a wrong has been committed and potential injury or unjust loss resulted to [the plaintiff] from such wrong, meeting the second and third prongs of the <u>Belvedere Condominium Ass'n</u> test.

<u>Pritchett v. Pingue</u>, Ohio App. No. 96APE11-1598, 1997 WL 578952 (10th Dist. Sept. 16, 1997). Ultimately, the third prong requires South Atlanta to demonstrate a causal connection between the Lupo's control of the corporation and the alleged injury or loss.

A review of the evidence presented at trial reveals that Lupo participated in the state court litigation that ultimately gave the plaintiff therein, River Radiology, an agreed judgment in the amount of $95,000.00 plus interest. <u>Plaintiff's Exhibit 3</u>. The evidence further revealed that River Radiology caused the sheriff to levy the property of Infinite View in satisfaction of the judgment. <u>Plaintiff's Exhibit 4 and 6</u>. Lupo testified that he understood that when the levies were executed by the sheriff, that Infinite View was prohibited from transferring any of its property and/or assets because it was subject to a levy of execution in the River Radiology litigation. (Lupo, Cross-Examination). Lupo further testified that he was aware as early as January of 2005 that Infinite View did not have the financial ability to purchase the MRI System required pursuant to the Agreement. <u>Id</u>. The evidence further reveals that neither Lupo nor the agents of Infinite View informed South Atlanta of the existence of the state court judgment and the execution of a levy upon the property and/or assets of Infinite View. <u>Id</u>. The concealment of Infinite View's precarious financial inability to honor the Agreement, coupled with a non-satisfied state court judgment that prohibited the transferring of Infinite View's property and/or assets, and Lupo's failure to return the Deposit (or cause

9

Infinite View to return same) as required by the Agreement, resulted in sufficient injury and loss to South Atlanta that satisfies the third prong of the Belvedere test.

South Atlanta has met its burden of establishing the requisite basis to pierce the corporate veil of Infinite View and hold Lupo personally liable for the corporate debts of Infinite View. Thusly, Lupo is personally liable for the debts of Infinite View.

## II. False Pretenses, False Representations or Actual Fraud Under 11 U.S.C. § 523(a)(2)(A)

South Atlanta cites §523(a)(2)(A) as a basis upon which the debt owed to it by the Debtor should be held nondischargeable. Section 523(a)(2)(A) excepts an individual from discharge for any debt:

> (2) for money, property, services or an extension, renewal or refinancing or credit to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523(a)(2)(A). "The creditor has the burden of proving by a preponderance of the evidence that a debt is nondischargeable under § 523(a)(2)(A)". Providian Bancorp v. Schartz (In re Shartz), 221 B.R. 397, 399 (B.A.P. 6th Cir.1998) (citing Grogan v. Garner, 498 U.S. 279, 286-287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)).

A creditor seeking to except debt from discharge pursuant §523(a)(2)(A) must prove: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. Rembert v. AT & T Universal Card Servs., Inc. ( In re Rembert), 141 F.3d 277, 280-81 (6th Cir.1998) (footnote omitted) (citing Longo v. McLaren ( In re McLaren ), 3 F.3d 958, 961 (6th Cir.1993)). In addition, the creditor's reliance on the false representations of the debtor

10

must be justifiable as opposed to reasonable. Bernard Lumber Co. v. Patrick (In re Patrick), 265 B.R. 782, 786 (Bankr. N.D. Ohio 2001)(citing Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). A plaintiff asserting a claim pursuant to §523(a)(2)(A) must demonstrate that property was obtained by false pretenses, a false representation or actual fraud, a showing of only one of the three conducts is required. James v. McCoy (In re McCoy), 114 B.R. 489, 498 (Bankr. S.D. Ohio 1990) "False pretenses" involves "an implied misrepresentation or conduct intended to create or foster a false impression." Id. While, "false representation" is defined as an expressed misrepresentation. . .[that] need not be written." Id.

South Atlanta asserts that Infinite View, Lupo and its agents misrepresented to South Atlanta that Infinite View owned the MRI System and that it would provide South Atlanta with the MRI System in exchange for payment in the amount of $385,000. In addition, South Atlanta asserts that Lupo knew the representations to be false at the time they were made and that the misrepresentations were made with the intent to deceive South Atlanta. Further, South Atlanta asserts that Lupo concealed from South Atlanta that Infinite View, at the time of the Agreement, was subject to levy of execution, that Infinite View was subject to possible appointment of a receiver, and Infinite View was the target of a tax investigation by the Federal Bureau of Investigation (the "FBI") and the Internal Revenue Service (the "IRS"). South Atlanta also asserts that prior to the execution of the Addendum, Lupo and Infinite View concealed from South Atlanta: (1) that the seller of the MRI System required the system to be shipped prior to June 1, 2005; (2) that Infinite View's only assets of value were subject to a consent judgment entry; and (4) that Infinite View had been under investigation by the FBI and the IRS.

Lupo testified that he was aware of the Agreement and the Addendum that were entered into by South Atlanta and Kyle Lulow on behalf of Infinite View. However, he

11

did not have any direct contact with South Atlanta regarding the transaction. (Lupo, Cross-Examination). Dr. Brice Choi ("Dr. Choi"), the owner of South Atlanta, does not dispute Lupo's testimony. (Choi, Direct). Dr. Choi testified that he initially contacted Infinite View through the internet and that the majority of the transaction was negotiated between Kyle Lulow, on the behalf of Infinite View, and Michael Dillard, on the behalf of South Atlanta. Id. South Atlanta has established through the evidence presented, however, that Infinite View failed to honor its end of the bargain of the Agreement. It is also undisputed that the Deposit given to Infinite View by South Atlanta, pursuant to the Agreement, was not returned upon Infinite View's non-delivery of the MRI System. South Atlanta has demonstrated that Infinite View obtained the Deposit through a material misrepresentation that Infinite View had the financial means to execute the terms of the Agreement at the time the Agreement was executed. Lupo knew such was false or was made with gross recklessness as to its truth.

The second element of §523(a)(2)(A) requires South Atlanta to establish that the representations made by the debtor must have been made with an "intent to deceive." Rembert, 141 F.3d at 280. When determining a debtor's intent to deceive pursuant to § 523(a)(2)(A), "the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." Rembert, 141 F.3d at 281. It is unlikely that a debtor will admit a deceitful act to defraud. Therefore, all facts including circumstantial evidence may be considered, such as "a suspicious timing of events, insolvency, or transfers to family members or insiders." EDM v. Harrison (In re Harrison), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003); See Bernard Lumber Co. v. Patrick (In re Patrick), 265 B.R. 782, 786 (Bankr. N.D. Ohio 2001). An examination of the evidence and the chronology of events herein are indicative of fraudulent intent. Specifically, at the time the Agreement was entered into, Infinite View did not have the

12

financial ability to fulfill its obligation under the Agreement. It is unrefuted that Infinite View was insolvent and undercapitalized at the time the Agreement was executed. It is also uncontested that Infinite View's assets were subject to a consent judgment entry issued in a pending state court action and that Infinite View had been under tax investigation by the FBI and the IRS. It is also uncontested that, that upon South Atlanta's request for the return of the Deposit, pursuant to the Agreement, Lupo did not cause Infinite View to return the Deposit.

South Atlanta has produced evidence that proves by a preponderance of the evidence that Lupo through Infinite View intended to deceive the creditor. Therefore, South Atlanta has satisfied its burden of proof as it relates to the second element of § 523(a)(2)(A).

The third element of the §523(a)(2)(A) dischargeability fraud test requires that a creditor establish that there was a justifiable reliance on the false representation made by the debtor. The Supreme Court in <u>Field v. Man</u>, held that reliance pursuant to §523(a)(2)(A) must be "justifiable." 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

The evidence shows South Atlanta relied upon representations made by Kyle Lulow, an agent of Infinite View, which were memorialized in the Proposal, Agreement and Addendum as they related to South Atlanta's purchase of the MRI System. Specifically, Infinite View represented to South Atlanta in the Agreement that it was the owner of the MRI System. <u>See</u> <u>Plaintiff's Exhibit 12</u>. Also, Infinite concealed from South Atlanta that Medical Arts of Commack, the third party seller of a MRI machine to Infinite View, required the entire purchase price to be paid prior to delivery of the MRI machine. (Lupo, Cross-Examination). Infinite View further concealed that it did not have the funds necessary to purchase the MRI machine. (Lupo, Cross-Examination).

13

South Atlanta justifiably relied upon the representations made by Lulow as contained in the transactional documents. Infinite View represented that it had the wherewithal to offer for sale to South Atlanta the MRI System. South Atlanta relied upon such representation and did so justifiably when the parties executed the subject documents. Lupo caused Infinite View to make assurances of performance on a future financial obligation while it was experiencing financial difficulties is relevant to his intent under §523(a)(2)(A). See Bernard Lumber Co., et al. v. Billy Joe Patrick (In re Patrick), 265 B.R. 782, 787 (Bankr. N.D. Ohio 2001). Therefore, South Atlanta has met its burden as to the third element of the §523(a)(2)(A) dischargeability fraud test.

The fourth and final element of the §523(a)(2) dischargeability fraud test requires the plaintiff to show the false representation of the debtor was the proximate cause of its loss. Proximate cause is something more than 'speculation as to what the creditor might have done in hypothetical circumstances.' " Candland v. Insurance Company of North America (In re Candland), 90 F.3d 1466, 1470 (quoting Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 306 (9th Cir.1992)). It depends "on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." Britton v. Price (In re Britton), 950 F.2d 602, 604 (9th Cir.1991); see also United States v. Spicer, 57 F.3d 1152, 1157 (D.C.Cir.1995). In summary, there must be "a direct link between the alleged fraud and the creation of the debt." McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 n. 7 (1st Cir.2001).

As proof that Lupo's misrepresentations were the proximate cause of South Atlanta's loss, Dr. Choi testified that he entered into the transaction with Infinite View based upon the misrepresentations of Lulow that were memorialized in the transactional documents. He subsequently learned the representations were false. (Dr. Choi, Direct) Dr. Choi further testified that he was never informed that Infinite View was insolvent,

14

undercapitalized and was facing financial difficulties. Id. Dr. Choi also testified that after South Atlanta requested the return of the Deposit, it was never returned. Id. Dr. Choi testified that South Atlanta incurred loss of revenue because of non-delivery of the MRI System and additional costs to acquire a similar MRI System. There is a connection between the representations made by Infinite View and its agents and the claim asserted by South Atlanta. It is reasonable to surmise that had South Atlanta not relied upon the misrepresentations of Infinite View, South Atlanta would not have entered into the Agreement with Infinite View. Certainly, South Atlanta would not have paid the Deposit and incurred the additional costs necessary to obtain a similar MRI System. See Plaintiff's Exhibit 44.

Accordingly, South Atlanta has met its burden as it relates to excepting its debt from discharge pursuant to § 523(a)(2)(A). With no corporate shield, Lupo is denied the protection of the corporate shield for his own actions. Therefore, the debt is hereby determined to be his own, rather than a corporate one, and thereby nondischargeable.

Having determined that the subject debt is nondischargeable under § 523(a)(2)(A), it is unnecessary for the Court to consider the other dischargeability allegations set forth in the Complaint. To the extent, however, it may be deemed prudent to address §§ 523(a)(4) and (a)(6) allegations, the following findings and conclusions are made.

III. **Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement or Larceny Under 11 U.S.C. § 523(a)(4)**

As an individual chapter 7 debtor, Lupo is entitled to a discharge of all of his prepetition debts, except for debts determined to be nondischargeable. South Atlanta asserts that the exception provided in § 523(a)(4) excepts its debt from discharge. Section 523(a)(4) provides:

15

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of
> this title does not discharge an individual debtor from any debt--
>
> . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny

11 U.S.C. § 523(a)(4). Specifically, South Atlanta claims that Lupo committed a fraud or

defalcation while acting in a fiduciary capacity and embezzlement.

In this case, in order to find a debt nondischargeable under § 523(a)(4) because of

defalcation, a plaintiff must prove by a preponderance of the evidence "(1) a pre-existing

fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss."

Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 390 (6th

Cir.2005) (citing R.E. America, Inc. v. Garver (In re Garver), 116 F.3d 176, 178-79

(6th Cir.1997)). The term "fiduciary relationship, for the purpose of § 523(a)(4) is

determined by federal, not state, law." Id. at 391 (citing Carlisle Cashway, Inc. v.

Johnson (In re Johnson), 691 F.2d 249, 251 (6th Cir.1982). The Sixth Circuit has defined

the term "fiduciary capacity" as used in § 523(a)(4) narrowly,  holding that the term

applies only to express or technical trust relationships where a specific property is placed

in the hands of the debtor as trustee.  In re Garver, 116 F.3d at 179. Also, "§ 523(a)(4)

applie[s] to trustees who misappropriate funds held in trust, and not to those who fail to

meet an obligation under a common law fiduciary relationship." Id. at  178-79.

Therefore, South Atlanta must prove that a fiduciary relationship existed between Lupo

and South Atlanta for the purposes of § 523(a)(4).  The evidence presented by South

Atlanta does not illustrate that a fiduciary relationship existed between South Atlanta and

Lupo.  The Agreement shows that there was a contract between Infinite View and South

Atlanta for the purchase of an MRI System and Infinite View failed to meet its obligation

under that Agreement. Plaintiff's Exhibit 12.  There was no evidence presented to

establish that there was an express or technical trust between Lupo and South Atlanta.

16

Thusly, South Atlanta has failed to meet its burden of proof. Thusly, the elements of §

523(a)(4) are unsatisfied in this particular regard

Embezzlement is defined by federal common law as "the fraudulent appropriation

of property by a person to whom such property has been entrusted or into whose hands it

has lawfully come." Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th

Cir.1996)(internal quotation and citations omitted). In order to prove embezzlement

under § 523(a)(4), a creditor must show that: "(1) he entrusted his property to the debtor;

(2) the debtor appropriated the property for a use other than that for which it was

entrusted; and (3) the circumstances indicate fraud." Aristocrat Lakewood Nursing

Home v. Dryja (In re Dryja), 259 B.R. 629 (Bankr. N.D. Ohio 2001).

It is undisputed that South Atlanta gave the Deposit to Infinite View as required

by the Agreement. See Plaintiff's Exhibits 12 and 51. There is ample evidence of

record to support South Atlanta's allegation that it believed that the Deposit was fully

refundable if the transaction did not close. See Plaintiff's Exhibit 12. Also, the evidence

presented shows that the Deposit to be fully refundable if South Atlanta cancelled two

days prior to the shipment of the MRI System. Id. The evidence further reveals that South

Atlanta made several requests to Infinite View for the return of the Deposit. See

Plaintiff's Exhibits 28, 33 and 34. The evidence illustrates that South Atlanta entrusted

its property, the Deposit, to Lupo's company (Infinite View); and the Deposit was fully

refundable to South Atlanta pursuant to the Agreement. Herein the corporate veil has

been pierced. Lupo testified that he utilized funds from a checking account where the

Deposit was placed for personal use. (Lupo, Cross-Examination). The Deposit, which

are the funds that South Atlanta contends were embezzled, were paid to Infinite View

pursuant to the Agreement. In accordance with the Agreement and upon South Atlanta's

request, Lupo failed to cause Infinite View to return the Deposit. Further, Infinite View

17

represented to South Atlanta in the Agreement that it was the owner of the MRI System, referenced therein. See Plaintiff's Exhibit 12. Therefore, the circumstances surrounding Infinite View's receipt of the Deposit and it's refusal to refund same to South Atlanta is fraudulent conduct.

Thusly, South Atlanta has met its burden by establishing embezzlement as a basis for excepting its debt from discharge under 11 U.S.C. § 523(a)(4). With the corporate veil pierced, Lupo is denied the protection of the corporate shield for his own actions. Therefore, the debt is held to be his own, rather than merely a corporate one, and nondischargeable.

### IV.    Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides the following:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. 523(a)(6). A creditor has the burden of proving by a preponderance of the evidence that a debt is nondischargeable. Grogan v. Garner, 498 U.S. 279, 291 (1991) (holding that the preponderance of the evidence standard applied to all of the § 523 dischargeability exceptions, including the fraud discharge exception); In re Stern, 345 F.3d 1036, 1043 (9th Cir.2003).

To except a debt from discharge under § 523(a)(6), a claimant must show "that the debtor caused an injury to another entity, or to the property of another entity, and that the debtor knew that his act would cause, or was substantially certain to cause, that injury." Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja), 259 B.R. 629, 633 (Bankr. N.D. Ohio 2001) (quoting In re Markowitz, 190 F.3d 455, 464 (6th Cir.1999)). "What constitutes 'willful and malicious injury' under § 523(a)(6) is a matter of federal

law." In re Baldwin, 249 F.3d 912, 917 (9th Cir.2001); In re Taylor, 322 B.R. 306, 309 (Bankr. N.D. Ohio 2004). Following the decision in Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed. 2d 90 (1988), "[t]he Sixth Circuit has held that a willful and malicious injury as defined under § 523(a)(6) is one where the debtor 'desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it." In re Moffitt, 252 B.R. 916, 922 (B.A.P. 6th Cir.2000) (citing In re Markowitz, 190 F.3d 455, 464 (6th Cir.1999)); In re Kennedy, 249 F.3d 576, 580 (6th Cir.2001).

Although the "willful" and "malicious" requirements will be found concurrently in most cases, the terms are distinct, and both requirements must be met under § 523(a)(6). In re Martin, 321 B.R. 437, 440 (Bankr. N.D. Ohio 2004). "The word 'willful' in [§ 523] (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Geiger, 523 U.S. at 61. Lack of excuse or justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6). In re Markowitz, 190 F.3d at 465 n.10.

When determining whether a debtor's conduct was willful, "[i]n addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action." In re Sicroff, 401 F.3d 1101, 1106 (9th Cir.2005)(quoting In re Su, 290 F.3d 1140, 1146 n.6 (9th Cir.2002)); In re Wood, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004).

The term malicious is defined as conduct taken in conscious disregard of one's duties or without just case or excuse. Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir.1986)(quoting Tinker v. Colwell, 193 U.S. 473, 486 (1904)). An injury is defined as

19

malicious under § 523(a)(6), when it is: "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." In re Sicroff, 401 F.3d at 1106 (citation omitted). "[T]he definition of malice requires a heightened level of culpability transcending mere willfulness." In re Martin, 321 B.R. at 442. "Injuries within the meaning of § 523(a)(6) are not confined to physical damage or destruction but also include an injury to intangible personal or property rights." In re Ellis, 152 B.R. 211, 215 (Bankr. E.D. Tenn. 1993) (citing 3 COLLIER ON BANKRUPTCY ¶ 523.16 (15th ed. 1992)); In re Morris, 12 B.R. 509, 511 (Bankr. Nev. 1981).

Finally, "[f]or a debt to fall within this exception to discharge the creditor has the burden of proving that it sustained an injury *as a result* of a willful and malicious act by the debtor. Thus, a debtor's actions must be determined to be the cause of the creditor's injury." In re Smith, 249 B.R. 748, 750 (Bankr. S.D. Ohio 2000)(emphasis in original).

It is apparent that South Atlanta suffered an injury based on Infinite View's failure to honor the Agreement, through a scheme of misconduct orchestrated by Lupo. As determined above, the circumstances created, or allowed to be created by Lupo's conduct, clearly evinces he intended the result of his actions.

Accordingly, the subject debt is nondischargeable under 11 U.S.C. § 523(a)(6).

## V.    Collateral Estoppel

South Atlanta seeks a determination that its debt arising from the prepetition default judgment it obtained against Infinite View in the state court action in Henry County, Georgia in nondischargeable pursuant to §§ 523(a)(2)(A) and (a)(6). South Atlanta asserts that pursuant to the doctrine of collateral estoppel the Georgia state court default judgment entered against Infinite View should be given preclusive effects against Lupo in this dischargeability proceeding. Collateral estoppel prohibits the re-litigation of issues that have been adjudicated in a prior lawsuit, and collateral estoppel principles

20

apply to dischargeability proceedings. <u>Grogan v. Garner</u>, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991).

A federal court must look to the law of the state in which the judgment was entered and give the order or judgment the same preclusive effect that it would receive in that state. <u>Marrese v. American Academy of Orthopedic Surgeons</u>, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985) (28 U.S.C. § 1738 commands a federal court to accept the rules chosen by the state from which the judgment is taken); <u>see also</u> <u>Bay Area Factors v. Calvert (In re Calvert)</u>, 105 F.3d 315, 317 (6th Cir.1997). The Sixth Circuit employs a two-part test to determine the preclusive effect that a state court default judgments has on dischargeability hearing:

> [First, the court should] consider . . . the law of the State in which the judgment was rendered to determine its preclusive effect. If the state court would not give preclusive effect to a default judgment, the analysis is complete. If, however, the state would accord the judgment preclusive effect, <u>Marrese</u> instructs that the federal court give preclusive effect to the judgment unless Congress has expressly or impliedly created an exception to [28 U.S.C.] § 1738 which ought to apply to the facts before the federal court.

<u>In re Calvert</u>, 105 F.3d at 317 (citing <u>Marrese v. American Academy of Orthopedic Surgeons</u>, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985)). Accordingly, if the Georgia courts would give preclusive effect to the default judgment in this case, then this Court is obligated under <u>Calvert</u> to do the same.

In determining the preclusive effect of a Georgia state court default judgment the court in <u>Lusk v. Williams (In re Williams)</u> held that:

> [T]he five elements for the application of collateral estoppel under Georgia law are (1) identity of parties or their privies; (2) identity of issues; (3) actual and final litigation of the issue in question; (4) essentiality of the adjudication to the earlier action; and (5) full and fair opportunity to litigate the issues in question.

282 B.R. 267 (Bankr. N.D. GA. 2002) (drawing five individual elements from various decisions of Georgia courts); see also GA. CODE ANN. § 9-12-40 (West 2006).

The first prong of the collateral estoppel test requires an identity of the parties or their privies in both the state court and dischargeability proceeding. "Generally speaking, privies are those legally represented at the trial. Privity connotes those who are in law so connected with a party to the judgment as to have such an identity of interest that the party to the judgment represented the same legal right; and where this identity is found to exist, all are alike concluded and bound by the judgment." Smith v. Wood, 115 Ga.App. 265, 269, 154 S.E.2d 646 (1967) (citations omitted). A stockholder may be in privity with his corporation, however, such that a judgment against the latter is res judicata as to the former, if the two are found to be alter egos. Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 1969, 395 U.S. 100, 108-111, 89 S.Ct. 1562, 23 L.Ed.2d 129, 139-141 (1969). In Shamrock Oil and Gas Co. v. Ethridge, D.Colo., 159 F.Supp. 693, 697 (D.Colo. 1958) the court stated:

> The effect of applying the alter ego doctrine . . . is that the corporation and the person who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound.

See also International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp., 369 F.Supp. 316, 329 (M.D. N.C. 1973); Hart v. Yamaha-Parts Distributors, Inc., 787 F.2d 1468, 1473 (11th Cir.1986). Lupo and Infinite View were both named plaintiffs in the Georgia state court lawsuit instituted by South Atlanta. (Lupo, Cross-Examination); See Plaintiff's Exhibits 37 and 46. It is also uncontested that Lupo was the president and sole shareholder of Infinite View. (Lupo, Cross-Examination). Having determined that Infinite View was the alter ego and that sufficient evidence exists to pierce the corporate veil, such is an adequate basis to support a finding

22

that the identity of the parties or their privies are the same in both actions. Therefore the Georgia Judgment satisfies the identity of the parties' prong.

The second prong of collateral estoppel requires a finding of the identity of issues between the judgment of the state court and the claims raised in this adversary proceeding. South Atlanta asserts claims pursuant to § 523(a)(2)(A), (a)(4) and (a)(6) against Lupo in this adversary proceeding. Notwithstanding, South Atlanta asserts the applicability of the doctrine of collateral estoppel as to its claim for an exception to discharge pursuant to § 523(a)(2)(A). In order to prove that a debt was obtained by fraud pursuant to § 523(a)(2)(A), a creditor must prove: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. See Rembert, 141 F.3d at 280-81. "The tort of fraud under Georgia law requires: (1) a false representation made by the defendant; (2) which the defendant knew was false; (3) made with an intent to deceive the plaintiff on such representation; and (5) damages suffered by the plaintiff as a result." Lusk, 282 B.R. at 272 (quoting Sterling Factors, Inc. v. Whelan, 245 B.R. 698, 705 (N.D. Ga. 2000). The Sterling court held that the requirements to prove a fraud claim under Georgia law are sufficiently identical to the elements required for a showing of fraud pursuant to § 523(a)(2)(A) to meet the identical issues prong of the collateral estoppel test. Sterling, 245 B.R. 705-06. The Georgia Judgment included a finding that Infinite View's actions constitute fraud. Plaintiff's Exhibit 46. Therefore, the identity of issues of the collateral estoppel test has been satisfied.

23

The third prong of the collateral estoppel test requires a showing that there was actual and final litigation of the issue in question. In deciding if a default judgment constitutes actual and final litigation the <u>Sterling</u> court provided:

> Georgia courts have recognized default judgment as a decision on the merits. <u>See</u> <u>Butler v. Home Furnishing Co.</u>, 163 Ga.App. 825, 296 S.E.2d 121 (1982); <u>Fierer v. Ashe</u>, 147 Ga.App. 446, 249 S.E.2d 270 (1978). At least two bankruptcy courts within the Eleventh Circuit have accordingly found the "actual litigation" requirement for purposes of a bankruptcy dischargeability proceeding satisfied by a default judgment rendered by a Georgia court. <u>See</u> <u>Graham</u>, 191 B.R. at 495; <u>Hooks</u>, 238 B.R. at 885. The court finds that the bankruptcy court did not err in finding the second prong of the Georgia collateral estoppel test satisfied.

245 B.R. at 706. The state court in the Georgia Judgment found, "by clear and convincing evidence the Defendant Infinite View, Inc.'s actions showed willful misconduct, malice, fraud, wantonness, oppression and an entire want of care." <u>Plaintiff's Exhibit 46</u>. Therefore, the issue of fraud was actually litigated because of the state court's specific finding. Thusly, the third prong of the collateral estoppel test has been satisfied.

The fourth prong of the collateral estoppel test requires a determination that the issue of fraud in this proceeding was also essential to the Georgia Judgment. The state court in the Georgia Judgment made a specific finding of fraud against Infinite View to whom Lupo is in privity with. <u>Id</u>; <u>See</u> <u>Lusk</u>, 282 B.R. at 274; <u>Branton v. Hooks (In re Hooks)</u>, 238 B.R. 880, 885 (Bankr. N.D. Ga. 1999). The state court determined that the evidence presented met the requirements to prove a fraud claim under Georgia law, which is sufficiently identical to the elements required for a showing of fraud pursuant to § 523(a)(2)(A). <u>See</u> <u>Sterling</u>, 245 B.R. 705-06. Thusly, the state court with its finding of fraud against Infinite View essentially determined the identical issue of Lupo's fraud pursuant to § 523(a)(2)(A).

24

The final prong of the collateral estoppel test hinges upon a full and fair opportunity to litigate the issues in question. This factor "is rooted in due process concerns. . . [t]herefore, for purposes of collateral estoppel the key to full and fair opportunity analysis is determining whether the party had adequate notice of the issue and was afforded the opportunity to participate in its determination." Lusk, 282 B.R. at 277. Lupo testified that he received the South Atlanta's complaint in the state court action in the summer of 2005. (Lupo, Cross-Examination). He also testified that he understood the basis for South Atlanta's complaint was the return of the Deposit. Id. Lupo further testified that he filed a request for extension of time to file an answer to the complaint. Id. He also testified that he received a copy of South Atlanta's motion for default judgment against Infinite View; and that he was aware of the default judgment hearing. Id. Lupo admitted that he had an opportunity to participate in the default hearing to defend Infinite View. Id. Lupo received South Atlanta's complaint, motion for default judgment against Infinite View and notice of hearing. Additionally, Lupo requested additional time from the state court to file an answer to the complaint. The Georgia Judgment against Infinite View resulted from Lupo and Infinite View's own failure to act, not from a lack of opportunity to litigate the issue. See e.g., Hooks, 238 B.R. at 886; Sterling Factors, 245 B.R. at 712-13; In re Graham, 191 B.R. 489, 489 (Bankr. N.D. Ga. 1996); In re Bush, 62 F.3d 1319, 1325 (11th Cir.1995).

As determined above, under Georgia law, the default judgment issued by the Georgia state court against Infinite View meets all the requirements under the doctrine of collateral estoppel.

## CONCLUSION

Accordingly, South Atlanta's Complaint to Determine Discharge is well-premised

and judgment is hereby rendered in favor of South Atlanta. Costs are awarded to the

Plaintiff, South Atlanta.

**IT IS SO ORDERED.**

Dated, this 31ˢᵗ day of
        October, 2006

RANDOLPH BAXTER
**CHIEF JUDGE**
**UNITED STATES BANKRUPTCY COURT**